# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                      No. CR 16-4518 JB

MAXIMO OLIVAS-PEREA

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss Information for Violation of Statute of Limitations, filed June 2, 2017 (Doc. 33)("MTD"). The Court held an evidentiary hearing on July 17, 2017. The primary issue is whether Defendant Maximo Olivas-Perea, a Mexican citizen who was deported in 2005, was "found" -- as that word is used in 8 U.S.C. § 1326 -- in the United States of America when he was booked into the Santa Fe County Detention Center in Santa Fe, New Mexico on June 11, 2011 -- approximately five-and-a-half years before Plaintiff United States charged Olivas-Perea in this case -- thereby triggering 18 U.S.C. § 3282's five-year statute of limitations. The Court concludes that, on June 13, 2011, federal immigration authorities knew that: (i) Olivas-Perea was in the United States; and (ii) Olivas-Perea had been deported previously. The Court also concludes that federal immigration authorities could have determined Olivas-Perea's whereabouts soon thereafter with the diligence typical of law enforcement. Accordingly, more than five years passed between when Olivas-Perea was found in the United States and the United States charged Olivas-Perea with Reentry of a Removed Alien ("Illegal Reentry"). Information, filed December 2, 2016

(Doc. 15)("Information").  Section 3282's five-year statute of limitations therefore bars Olivas-Perea's prosecution, so the Court grants the MTD.

## FACTUAL BACKGROUND

The United States' Criminal Complaint, filed December 23, 2015 (Doc. 1)("Criminal Complaint"), states:

> A review of Maximo OLIVAS-Perea's immigration file revealed that he is a citizen and national of Mexico who was ordered removed from the United States by an Immigration Judge in El Paso, TX on April 7, 1997 and was physically removed from the United States to Mexico on April 8, 1997. Maximo OLIVAS-Perea was last removed from the United States to Mexico on April 8, 1997.  Maximo OLIVAS-Perea was ordered removed from the United States subsequent to a conviction for Possession with Intent to Distribute more than 50 kilograms of Marijuana in violation of 21 USC 841(a)(1) and 21 USC [841](b)(1)(C) on March 16, 1994 in U.S. District Court for the District of New Mexico.
>
> There is no evidence in the immigration file of Maximo OLIVAS-Perea applying for or receiving permission to re-enter the United States.

Criminal Complaint at 2.  The Court takes facts from the Criminal Complaint for the purpose of deciding the MTD, but it acknowledges that Olivas-Perea is presumed innocent and that, in a criminal prosecution, the United States would need to prove, beyond a reasonable doubt, all of the elements of Illegal Reentry, including that Olivas-Perea had been deported previously.

Olivas-Perea was booked into the Santa Fe County Detention Center on June 11, 2011 for failure to appear.  See Defendant's Exhibit E at 2 ("Booking Form").  See also MTD ¶ 15, at 7; Inmate Booking List for OLIVAS, MAX at 1, filed June 2, 2017 (Doc. 33-3)("Booking List").  Olivas-Perea was booked as "Max Olivas."  Booking List at 1.  See United States' Response to Defendant's Motion to Dismiss Information for Violation of Statute of Limitations (Doc. 33) at 1, filed June 23, 2017 (Doc. 35)("Response").  Olivas-Perea's fingerprints were taken while he was in custody.  See Response at 1.  Just over three hours later, in the early morning of June 12, 2011, Olivas-Perea was released on bond.  See Booking List at 1.

Olivas-Perea's fingerprints were sent to the Criminal Justice Information Services Division of the Federal Bureau of Investigation ("CJIS").[1] See Department of Homeland Security Person Summary at 1, filed June 23, 2017 (Doc. 36-1)("DHS Person Summary"); Transcript of Hearing at 31:1-9 (Simms, Saucuedo), held July 17, 2017 ("Tr.").[2] CJIS then sent those fingerprints to the Department of Homeland Security ("Homeland Security") to check the fingerprints against its immigration database. See DHS Person Summary at 1; Secured Communities at 1, filed June 2, 2017 (Doc. 33-1)("For decades, local jurisdictions have shared the fingerprints of individuals arrested and/or booked into custody with the FBI to see if those individuals have a criminal record and outstanding warrants. Under Secured Communities, the FBI automatically sends the fingerprints to Homeland Security to check against its immigration databases.").

Homeland Security matched Olivas-Perea's fingerprints taken by the Santa Fe Police Department with the fingerprints it had on file from Olivas-Perea's earlier encounters with federal immigration authorities. See DHS Person Summary at 1. The DHS Person Summary

---

[1]The Federal Bureau of Investigation's website states:

In the summer of 1924, the FBI created an Identification Division (informally called "Ident" in the organization for many years to come) to gather prints from police agencies nationwide and to search them upon request for matches to criminals and crime evidence. The CJIS Division was established in February 1992 out of the former Identification Division to serve as the focal point and central repository for criminal justice information services in the FBI. It is the largest division in the FBI. Programs initially consolidated under the CJIS Division included the National Crime Information Center (NCIC), Uniform Crime Reporting (UCR), and Fingerprint Identification. In addition, responsibility for several ongoing technological initiatives was transferred to the CJIS Division, including the Integrated Automated Fingerprint Identification System (IAFIS), NCIC 2000, and the National Incident-Based Reporting System (NIBRS).

Criminal Justice Information Services, FBI, https://www.fbi.gov/services/cjis.

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

lists several variations on Olivas-Perea's name, including: (i) Maximo Olivas Perea; (ii) Max Olivas; and (iii) Maximo Olivas-Perea.  See DHS Person Summary at 1.  That entry on the DHS Person Summary is dated June 13, 2011.  See DHS Person Summary at 1.

On July 24, 2013, the Santa Fe Police Department again arrested Olivas-Perea.  See Response at 1; Criminal Complaint at 1.  He was arrested for Aggravated Driving While Intoxicated.  See Response at 1; Criminal Complaint at 1.  Olivas-Perea was photographed and fingerprinted as part of this law-enforcement encounter.  See Response at 1-2; Criminal Complaint at 1.  Olivas-Perea was released on bond the next day.  See Booking List at 1.

On March 25, 2014, Olivas-Perea renewed his New Mexico driver's license.  See Response at 2; Tr. 59:6-14 (Robert, Saucuedo); Criminal Complaint at 1.  Olivas-Perea's renewed driver's license listed his address as 3612 North Platte Road, Santa Fe, New Mexico.  See Tr. at 65:22-24 (Simms).  Olivas-Perea moved to that address "a couple of years" before his 2011 arrest.  Tr. at 14:2-5 (Olivas-Perea).  Olivas-Perea continued to live at that address until he was arrested in 2016.  See Tr. at 15:23-16:4, 19-23 (Robert, Olivas-Perea).[3]

Because of Olivas-Perea's driver's license renewal, local Immigration and Customs Enforcement ("ICE") officers received a referral from ICE's National Criminal Analysis and

---

[3]Olivas-Perea's testimony at the hearing indicates that he was arrested on January 11, 2016, see Tr. at 15:16-22 (Olivas-Perea), while the federal arrest warrant's return indicates that Olivas-Perea was arrested on November 14, 2016, see Arrest Warrant and Return at 1 (warrant dated December 23, 2015)(return dated November 14, 2016), filed November 15, 2016 (Doc. 7). The record does not clearly explain that ten-month discrepancy, but the Booking List indicates that Olivas-Perea was in state custody from January 13, 2016 until November 14, 2016 and lists the reason for Olivas-Perea's release as "TRANSPORT/Transport."  Booking List at 1.  The Court speculates that Olivas-Perea was originally arrested by state authorities -- or at least held in state custody -- and that the federal arrest warrant was not returned until Olivas-Perea was transferred to federal custody on November 14, 2016.  That version of events is in accord with the United States' briefing.  See Response at 2 ("Defendant was arrested on January 13, 2016. Defendant was booked into the Santa Fe County Jail on 3 warrants out of Santa Fe County, and the reentry warrant.  On November 14, 2016, the Santa Fe County Jail turned the Defendant over to ICE custody.").

Targeting Center ("NCATC") on December 18, 2015. See Response at 2; Tr. at 66:3-8 (Simms). The NCATC matched the photograph from Olivas-Perea's driver's license renewal to the photograph and fingerprints from Olivas-Perea's 2013 arrest. See Tr. at 66:3-8 (Simms); Criminal Complaint at 1. The NCATC referral accordingly told the local ICE officers that "Defendant, a prior deported aggravated felon, was residing in Santa Fe County." Response at 2. See Criminal Complaint at 1. Federal immigration authorities filed the Criminal Complaint, alleging Illegal Reentry, on December 23, 2015. See Criminal Complaint at 1. That day, an arrest warrant was issued. See Arrest Warrant at 1, filed December 23, 2015 (Doc. 2). The warrant was returned on November 14, 2016, and the return indicated that Olivas-Perea was arrested on that day in Santa Fe. See Arrest Warrant and Return at 1 (warrant dated December 23, 2015)(return dated November 14, 2016), filed November 15, 2016 (Doc. 7).

## PROCEDURAL HISTORY

On December 2, 2016, the United States charged Olivas-Perea with Illegal Reentry. See Information at 1, filed December 2, 2016 (Doc. 15)("Information"). See also Waiver of Indictment, filed December 2, 2016 (Doc. 16). The Information alleges that Olivas-Perea was found "[o]n or about December 18, 2015." Information at 1. On the same day that the United States instituted the Information, the parties notified the Court of a fast track plea agreement under rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. See Fast Track Plea Agreement at 1, filed December 2, 2016 (Doc. 18)("Plea Agreement"). Based on the Plea Agreement, see Plea Agreement ¶ 4(e), at 3-4, "pursuant to U.S.S.G. § 5K3.1, the United States move[d] for a downward departure from the otherwise applicable adjusted offense level," United States' Motion for § 5K3.1 Downward Departure, filed Mar. 13, 2017 (Doc. 30)("Motion for Downward Departure"). The Court rejected the Plea Agreement, see Sentencing Minute Sheet at

2, filed March 13, 2017 (Doc. 29), and denied the Motion for Downward Departure, <u>see</u> Order, filed March 13, 2017 (Doc. 31). Because the Court rejected the Plea Agreement, Olivas-Perea withdrew his guilty plea. <u>See</u> Notice of Withdrawal of Guilty Plea at 2, filed May 8, 2017 (Doc. 32).

       **1.**       <u>**The Briefing.**</u>

       Olivas-Perea filed the MTD on June 2, 2017. <u>See</u> MTD at 9. Olivas-Perea argues that "[t]he information in this cause was filed more than five years after the government knew, or in the exercise of appropriate diligence should have known, that Mr. Olivas was present in the United States, in violation of the relevant statute of limitations." MTD ¶ 1, at 1. Olivas-Perea contends that an Illegal Reentry offense is complete "'when the government knows, or could have known through the exercise of diligence typical of law enforcement, the following: (1) the defendant is a prior deportee, (2) the defendant is illegally present in the United States (i.e., the defendant is an illegal alien), and (3) the defendant's whereabouts.'" MTD ¶ 11, at 5 (quoting <u>United States v. Villarreal-Ortiz</u>, 553 F.3d 1326, 1330 (10th Cir. 2009)(per curiam)).

       Olivas-Perea argues that, because the Secured Communities program became active in Santa Fe County, New Mexico on February 8, 2011, <u>see</u> MTD ¶ 15, at 7, "[t]he government, and specifically [Homeland Security], was aware, or in the exercise of the diligence reasonably expected of law enforcement should have been aware, of Mr. Olivas' presence in the United States . . . and the fact that he was a previously deported and presently deportable person on June 11, 2011," MTD ¶ 18, at 7-8. <u>See</u> Secured Communities at 1, filed June 2, 2017 (Doc. 33-1)("For decades, local jurisdictions have shared the fingerprints of individuals arrested and/or booked into custody with the FBI to see if those individuals have a criminal record and outstanding warrants. Under Secured Communities, the FBI automatically sends the fingerprints

to DHS to check against its immigration databases.").  According to Olivas-Perea, "[Homeland Security] was aware, or in the exercise of the diligence reasonably expected of law enforcement should have been aware, of . . . his whereabouts," MTD ¶ 18, at 7-8, because he was "booked into the Santa Fe County Detention Center" under his own name, MTD ¶ 17, at 7, and because he "remained in the United States continuously from on or before June 11, 2011[;] [h]e lived in Santa Fe with his family[; and h]e was not in hiding or seeking to avoid detection," MTD ¶ 16, at 7.

The United States filed its Response on June 23, 2017.  See Response at 7.  The United States argues that Olivas-Perea was not found in the United States until December 18, 2015, because that date is "when agents discovered defendant's status as a previously deported alien." Response at 5.  The United States contends that Olivas-Perea's June 11, 2011, arrest took place on a Saturday night, and Olivas-Perea was released just after midnight on Sunday morning, so, "[a]lthough jail personnel submitted Defendant's fingerprints, . . . there would have been no one on the other side of the submission . . . to make a match" and thereby determine Olivas-Perea's immigration status.  Response at 5.  The United States argues: "In fact, Government's Exhibit 1 shows the prints were not submitted until the following Monday, June 13, 2011, over 24 hours after Defendant had been released."  Response at 5 (citing DHS Person Summary at 1).  It follows, according to the United States, that "the Defendant was released before authorities would have been able to ascertain his legal status."  Response at 5.

The United States also argues that Olivas-Perea "concealed his true identity by giving the name 'Max Olivas,' rather than his full name."  Response at 6.  "Knowledge of defendant's physical presence in the United States and his status as a previously deported alien should not be

imputed to the government when Defendant surreptitiously reentered the United States and used a false name."  Response at 6.

Olivas-Perea filed his reply brief on July 14, 2017.  See Mr. Olivas' Reply to the Government's Response to Motion to Dismiss at 7, filed July 14, 2017 (Doc. 44)("Reply").  Olivas-Perea states that, in the MTD, he based his argument on Santa Fe County's "participation in the Secure Communities program, giving rise to a presumption that ICE had 'constructive' knowledge of his illegal presence in the United States on, or shortly after, his booking into" the Santa Fe County jail.  Reply at 2.  Olivas-Perea elaborates:

> Mr. Olivas does not abandon that argument; however, in its response to the motion to dismiss, the government submitted evidence which proves that ICE in fact had actual knowledge of Mr. Olivas's illegal presence in the United States as of June 13, 2011.  See [DHS Person Summary at 1].  This document demonstrates that, as of June 13, 2011, DHS possessed actual knowledge that Mr. Olivas, a prior deportee, was illegally present in the United States.  The only question that remains, therefore, is whether law enforcement knew, or could have known "through the exercise of diligence typical of law enforcement," the final element of the inquiry: Mr. Olivas's whereabouts.
>
> Knowing Mr. Olivas's whereabouts does not mean that law enforcement had to know Mr. Olivas's precise location; nor, as the government appears to suggest, does it require that Mr. Olivas have remained incarcerated.  If "diligence typical of law enforcement" required only that the authorities be able to find people in jail, that would be cause for concern for the efficacy of law enforcement.  This element requires only that, through the exertion of reasonable efforts, the kind we would expect from professional law enforcement, authorities could find Mr. Olivas at or around the time that those authorities became aware of the fact of his arrest.

Reply at 3.  Olivas-Perea then argues that federal immigration authorities could have determined his whereabouts in June of 2011, because ICE received the same information on June 13, 2011 as it did in the December 18, 2015 referral from NCATC.  See Reply at 4.  Olivas-Perea elaborates:

> The only difference is that, in response to the information it received in 2011, ICE did nothing, and in response to the information it received in 2015, ICE exercised diligence typical of law enforcement by pulling Mr. Olivas's driver's license, matching up his driver's license photo with his DHS photo, and, eventually, obtaining and executing an arrest warrant on Mr. Olivas.  These actions constitute

"the exercise of diligence typical of law enforcement." The mere fact that ICE apparently chose not to exercise the same diligence in 2011 does not excuse the violation of the statute of limitations.

Reply at 4. Olivas-Perea also contends that "[t]he complete booking form from the Santa Fe County Detention Facility prepared in connection with his June, 2011 arrest includes substantial detailed information about Mr. Olivas, including his residence address" -- which is where Olivas-Perea returned after being released on June 12, 2013, and where he continued to reside until he was arrested in this case -- such that "[n]o investigative skill would have been required to locate Mr. Olivas following his release from Santa Fe County custody in June of 2011." Reply at 5. According to Olivas-Perea, that he obtained a copy of the booking form from the June 11, 2011, arrest "with a simple IPRA [Inspection of Public Records Act, N.M. Stat. Ann. § 14-2-1 to -12] request, a process available even to those not a part of law enforcement" means that "[s]uch an effort is surely within 'the exercise of diligence typical of law enforcement.'" Reply at 5.

Olivas-Perea then addressed the United States' argument that "Mr. Olivas' use of an 'alias' absolved law enforcement of its obligation to exercise typical diligence." Reply at 5. Olivas-Perea first notes that the DHS Person Summary indicates that Homeland Security equated "Max Olivas" with "Maximo Olivas-Perea." See Reply at 5 (citing DHS Person Summary at 1). Olivas-Perea then casts aspersions on "the suggestion that 'Max Olivas' is an alias of such cunning as to be able to confound the police in their search for 'Maximo Olivas-Perea.'" Reply at 5. Olivas-Perea then concludes by observing that "Mr. Olivas gave his true name, or at least the proper diminutive of it, his correct residence address and other personal identifying information, leaving minimally diligent law enforcement officers a clearly observable record of Mr. Olivas' presence, status and trail to his whereabouts." Reply at 6.

2.     **The Hearing.**

The Court held an evidentiary hearing on July 17, 2017.  See Tr. at 1:2-3 (Court).
Olivas-Perea began by introducing the booking sheet from Olivas-Perea's June 11, 2011, arrest
-- which he obtained via a "Freedom of Information request under state law of New Mexico" --
as Defense Exhibit E.  Tr. at 2:25-3:4 (Robert).  Olivas-Perea then commented that "Exhibit E,
among other pertinent information, most importantly contains information about where Mr.
Olivas-Perea lived."  Tr. at 3:5-7 (Robert).  Olivas-Perea displayed the DHS Person Summary to
the Court and brought the Court's attention to the entry dated June 13, 2011 at 9:47 a.m.  See Tr.
at 6:9-22 (Robert).  Olivas-Perea contended that, because "the Secure Communities program
[identified Olivas-Perea] to immigration authorities as somebody that's been arrested by a local
jurisdiction and who has already been [deported,] . . . that on that date federal immigration
authorities had actual knowledge of" Olivas-Perea's presence in the United States and status as
"a previous deportee."  Tr. at 6:21-7:8 (Robert).

In response to the Court's query, Olivas-Perea admitted that the DHS Person Summary
does not contain Olivas-Perea's address.  See Tr. at 7:9-11 (Court, Robert).  Olivas-Perea argued,
however, that immigration authorities had constructive knowledge of Olivas-Perea's address,
because, "had they exercised the diligence typically expected of law enforcement they would
have had th[at] information."  Tr. at 9:1-3 (Robert).  To make that point, Olivas-Perea argued
that, "in November of 2015, [immigration authorities] had the same information that they had in
2011[, but] different from 2011, in 2015 they acted on that information[,] went to [his] house[,
and] arrested him."  Tr. at 9:5-8 (Robert).

Olivas-Perea's counsel then offered to have Olivas-Perea testify that

[h]e had lived at the North Platte address for at least a couple of years before he
was arrested in 2011, and that's where he was arrested in 2015.  And that's where

parts of his family continue to live . . . .  And when he was released from custody in 2011 . . . he went home to the residence on North Platte Street, and there he remained until he was arrested more than five years later, in November of 2015. He went to work after he was released from custody.  He worked at the same place for a long time so both his residence and his employment were remarkably consistent before and following his arrest and release in June of 2011.  It would have been child's play for anybody who was interested certainly somebody with a badge to have found out where he lives simply by look[ing] at the booking records and even to find out where he worked by asking a couple of questions.

Tr. at 11:2-24 (Robert).  The United States indicated that it would "prefer that [Olivas-Perea] provide those facts under oath."  Tr. at 12: 24-24 (Simms).  Accordingly, Olivas-Perea took the stand.  <u>See</u> Tr. at 13:1-13 (Court, Robert).

Olivas-Perea testified that he lived at 3612 North Platte Road in Santa Fe from a couple of years before his arrest on June 11, 2011 until he was arrested in January, 2016.  <u>See</u> Tr. at 13:25-15:22 (Robert and Olivas-Perea).  He also testified that he did not leave Santa Fe between those two arrests.  <u>See</u> Tr. at 15:23-16:4 (Robert and Olivas-Perea).  Olivas-Perea added that, when he was arrested in January, 2016, he had been working for the same company, Lopez Roofing, for fifteen years.  <u>See</u> Tr. at 16:5-23 (Robert and Olivas-Perea).  On cross examination, Olivas-Perea testified that, when he was arrested on June 11, 2011, he did not have a driver's license, and his car was not insured with the state.  <u>See</u> Tr. at 17:17-23 (Simms and Olivas-Perea).  On redirect, Olivas-Perea testified that, although he did not have a driver's license when he was arrested on June 11, 2011, he had a "Santa Fe issued ID" that contained his name and listed his address as 3612 North Platte Road.  Tr. at 18:4-12 (Robert and Olivas-Perea).  Olivas-Perea also testified that he gave that ID to the police officer who arrested him and that the ID was never returned to him.  <u>See</u> Tr. at 18:13-19 (Robert and Olivas-Perea).  That statement concluded Olivas-Perea's testimony.  <u>See</u> Tr. at 18:21-24 (Court).  Olivas-Perea concluded his argument in favor of the MTD by noting that the United States "has the burden to establish that it brought its charge within the applicable statute of limitations."  Tr. at 19:5-7 (Robert).

In response, the United States introduced two documents into evidence. See Tr. at 24:17-18 (Simms)(proffering documents); id. at 25:24-25 (Robert)(acquiescing to the admission of the documents into evidence). The first document, United States' Exhibit 3, is a copy of "ICE's MOU [Memorandum of Understanding] with the State of New Mexico on how situations are supposed to be handled through Secured Communities." Tr. at 24:20-23 (Simms). The second document, United States' Exhibit 4 ("ICE logbook") is a printout that "pertains to the Secured Communities database as far as the fingerprint matches that they got on 6/13 of 2011," Tr. at 25:6-8 (Simms), and "is also evidence that [ICE] did identify Mr. Olivas-Perea through a Secured Communities hit," Tr. at 24:23-25 (Simms). The United States also called to the stand an ICE agent, Deportation Officer Matthew Saucedo, see Tr. at 27:10 (Saucedo), who did "have personal knowledge of what was happening in 2011, because he's worked the Santa Fe County area for the last 10 years," Tr. at 26:24-27:1 (Simms).

Saucedo explained that the ICE logbook is a "printout of a log book that El Paso -- ICE in El Paso holds." Tr. at 32:6-7 (Saucedo). According to Saucedo, ICE has "a special operation communication center or command center" in El Paso via the following process:

> Fingerprints are taken at the local level. They are referred to FBI. They're run through FBI's database. FBI runs them through US Visit.[4] US Visit relays that information back, and that information is sent towards the Law Enforcement Support Center,[5] which is in Vermont I believe. That LESC support center sends

---

[4]US-VISIT is now Homeland Security's Office of Biometric Identity Management ("OBIM"). Office of Biometric Identity Management Identification Services, HOMELAND SECURITY (February 10, 2016), http://www.dhs.gov/obim-biometric-identification-services. OBIM "supplies the technology for matching, storing, and sharing biometric data. OBIM is the lead designated provider of biometric identity services for [Homeland Security] and maintains the largest biometric repository in the U.S. government." Biometrics, HOMELAND SECURITY (February 6, 2017), http://www.dhs.gov/biometrics.

[5]ICE states:

> The Law Enforcement Support Center is a national enforcement operations facility administered by U.S. Immigration and Customs Enforcement

that information to Secure Communities locally which would be there in El Paso.

Tr. at 7-10, 12-19 (Saucedo).  Saucedo stated that the "ABQ REINST CASE" designation in the

Olivas-Perea entry of the ICE logbook

> just means it's a reinstatement.  Which is the form 871, which is utilized and it is entitled notice to reinstate a prior order and that's the form, the legal form that we use to reinstate his prior [deportation] order.  So it's a shortened verbiage for Albuquerque reinstate or reinstatement case.

Tr. at 33:20-25 (Saucedo).  Saucedo could, thus, tell that Olivas-Perea had previously been

deported by looking at that designation, but he could not determine the cause of the previous

deportation.  See Tr. at 34:1-6 (Simms, Saucedo).  Saucedo added that neither the DHS Person

Summary nor Exhibit 1 contained information regarding Olivas-Perea's narcotics conviction.

See Tr. at 36:25-37:3 (Simms, Saucedo).  Additionally, Saucedo indicated that the Santa Fe

County jail did not send Olivas-Perea's booking form to ICE, because "Santa Fe County would

never send us that information or nor have they prior or past, roughly 2007, 2008."  Tr. at 37:16-

21 (Simms, Saucedo).

---

(ICE), the largest investigative agency in the Department of Homeland Security (DHS). The center is a single national point of contact that provides timely immigration status, identity information, and real-time assistance to local, state, and federal law enforcement agencies on aliens suspected, arrested, or convicted of criminal activity. The center protects and defends the United States by sharing timely and relevant ICE information with our law enforcement partners around the world.

Located in Williston, Vermont, the center operates 24 hours a day, 7 days a week, 365 days a year. The primary users of the center are state and local law enforcement officers seeking information regarding aliens encountered in the course of their daily enforcement activities. The center serves as a national enforcement operations center, responding to inquiries from federal, state, and local criminal justice agencies concerning aliens under investigation or arrested.

Law Enforcement Support Center, U.S. Immigration and Customs Enforcement (June 2, 2016), http://www.ice.gov/lesc.

On cross examination, Saucedo agreed with Olivas-Perea's statements that "[t]here is no[] doubt that a Secured Communities hit was received in 2011, based on your review of the records," Tr. at 40:5-8 (Robert, Saucedo), and that "[t]here is no question that the federal authorities had the information about the fact that Mr. Olivas-Perea had been encountered by law enforcement in June of 2011, and that he was a prior deportee," Tr. at 40:24-41:4 (Robert, Saucedo). Saucedo indicated, however, that, "[b]ased upon Santa Fe County's failure to recognize or work with ICE, it was a little more difficult, actually it was a lot more difficult to get information about individuals that were arrested apart from Secured Communities." Tr. at 50:15-19 (Saucedo). On redirect examination, Saucedo indicated that "we don't know whether or not the ICE office in Albuquerque received this notification from Secured Communities." Tr. at 58:4-8 (Simms, Saucedo).

By way of rebuttal, Olivas-Perea called Stephanie Porter, a paralegal for the Federal Public Defender, to the stand and asked her to explain the steps that she took to obtain Olivas-Perea's booking form. See Tr. at 60:7-8 (Robert); id. at 60:17-61:3(Robert, Porter). She stated that

> I just Googled Santa Fe County Adult Detention Facility and I sent an email to that facility and I told them I am making an IPRA request. By IPRA, I mean the New Mexico analog of federal -- FOIA request. I said I am making an IPRA request for the entire booking file on the June 11, 2011 arrest of Maximo Olivas-Perea. And I think I gave his birth date, and I may have given his social, or at least the last four of his social. That was on June 29 that I made that request. . . . I received a response within three days saying that they had received my IPRA request and that they would process it within the 15 day requirement under the New Mexico statute. I received the booking file, Defendant's Exhibit E, on July 13 . . . .

Tr. at 61:4-13, 15-19 (Porter).

The United States then argued that Olivas-Perea was not found in the United States in 2011, because "we can't confirm that ICE agents in Albuquerque were apprised of the

information" that Olivas-Perea was in the United States and that he had previously been deported, and because of "the fact that resources seem to be very thin, with 6 officers in charge of all the apprehensions in 21 counties." Tr. at 67:22-68:1 (Simms). The United States argued that Olivas-Perea's driver's license renewal in 2014 was significant, because it was the mechanism that informed "the local ICE officer" of Olivas-Perea's residence. Tr. at 72:12-23 (Simms). See id. at 73:1-3 (Simms).

Olivas-Perea then took to the podium and argued that the relevant inquiry for this case is not what any particular person within the federal government knew but rather what was known by "the grand structure of federal law enforcement." Tr. at 73:16-23 (Robert). Olivas-Perea also argued that the standard for constructive knowledge -- "[r]easonable diligence[,] the kinds of diligence typically expected of law enforcement" -- is "an objective standard by its terms," so subjective factors, such as the amount of resources available to federal immigration authorities, are irrelevant. Tr. at 79:11-21 (Robert). Olivas-Perea analogized to another objective standard -- the level of diligence expected of lawyers:

> What if I was accused of not being sufficiently diligent[,] of committing malpractice[,] of not being professionally responsible[.] [A]re they going to give me a break because they say I was busy or home sick that week[?] [No.] I am expected to perform a standard that's set objectively by the people who determines those things.

Tr. at 80:4-11 (Robert). It follows, according to Olivas-Perea, that

> regardless of whatever the particular circumstances were at that time[,] . . . that Your Honor should impose or evaluate this situation on the basis of an objective standard that doesn't necessarily give points one way or the other [based on the] circumstances that whoever was doing the job at the time was dealing with at the time.

Tr. at 81:1-9 (Robert). Olivas-Perea concluded by observing that the United States bears the burden of proof with respect to "establishing that [the Information] was filed within the five-year statute of limitations." Tr. at 86:16-87:3 (Robert).

## LAW REGARDING MOTIONS TO DISMISS IN CRIMINAL CASES

The Federal Rules of Criminal Procedure contain no analog for summary judgment under rule 56 of the Federal Rules of Civil Procedure.  See United States v. China Star, Inc., 375 F. Supp. 2d 1291, 1293 (D.N.M. 2005)(Browning, J.)("Under Tenth Circuit law, the Court is not free to determine, like on a motion for summary judgment under the Federal Rules of Civil Procedure, whether a genuine issue of material fact exists.").   "Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion."  United States v. Hall, 20 F.3d 1084, 1087 (10th Cir. 1994).   When testing an indictment's sufficiency before trial, an indictment's allegations are taken as true, and courts should not consider evidence outside of the indictment.  See United States v. Hall, 20 F.3d at 1087.   See also United States v. Tafoya, 376 F. Supp. 2d 1257, 1260 (D.N.M. 2005)(Browning, J.).   The United States Court of Appeals for the Tenth Circuit has, however, carved out an exception to that general rule for cases "where the underlying facts [are] essentially undisputed and the government fail[s] to object to the district court's resort to evidence beyond the four corners of the indictment."  United States v. Hall, 20 F.3d at 1087.   "Under this scenario, a pretrial dismissal is essentially a determination that, *as a matter of law,* the government is incapable of proving its case beyond a reasonable doubt."  United States v. Hall, 20 F.3d at 1088 (emphasis in original).

The Federal Rules of Criminal Procedure permit defendants, however, to assert defects other than evidentiary insufficiency before trial, because rule 12(b) allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  See Fed. R. Crim. P. 12(b)(1) advisory committee note to 2014 amendments ("The more modern phrase 'trial on the merits' is substituted for the more

archaic phrase 'trial of the general issue.' No change of meaning is intended."). A defendant

can -- but need not -- assert a statute-of-limitations defense via pretrial motion, because,

> [i]n the . . . group of objections and defenses, which the defendant at his option
> may raise by motion before trial, are included all defenses and objections which
> are capable of determination without a trial of the general issue. They include
> such matters as former jeopardy, former conviction, former acquittal, **statute of
> limitations**, immunity, lack of jurisdiction, failure of indictment or information to
> state an offense, etc. Such matters have been heretofore raised by demurrers,
> special pleas in bar and motions to quash.

Fed. R. Crim. P. 12(b)(1) advisory committee's note to 1944 adoption (emphasis added).

That "Rule 47 applies to a pretrial motion," Fed R. Crim. P. 12(b)(1), means that the

Court may consider evidence outside of the indictment, <u>see</u> Rule 47(d)("The moving party must

serve any supporting affidavit with the motion. A responding party must serve any opposing

affidavit at least one day before the hearing, unless the court permits later service."). On the

other hand, rule 47(d) does not permit courts to conduct a "trial on the merits," Fed. R. Crim. P.

12(b)(1), via motion practice, because

> [t]he last sentence providing that a motion may be supported by affidavit is not
> intended to permit 'speaking motions' (e.g. motion to dismiss an indictment for
> insufficiency supported by affidavits), but to authorize the use of affidavits when
> affidavits are appropriate to establish a fact (e.g. authority to take a deposition or
> former jeopardy).

Fed R. Crim. P. 47 advisory committee's note to 1944 adoption.

A court can determine a pretrial motion without a trial on the merits when a motion goes

to "what evidence might be admitted at trial . . . or the conduct of and preparation for trial."

<u>United States v. Pope</u>, 613 F.3d 1255, 1260 (10th Cir. 2010)(Gorsuch, J.). Pretrial motions that

"seek and result in dismissal of the case altogether but that can be decided, at least in the

circumstances of the case at hand, without deciding any disputed questions of fact about the

circumstances of the alleged crime"-- <u>i.e.</u>, motions that "involve only the taking of evidence that

is 'entirely segregable from the evidence to be presented at trial'" -- also qualify under rule

12(b)(1). United States v. Pope, 613 F.3d at 1260 (quoting United States v. Barletta, 644 F.2d 50, 58 (1st Cir. 1981)). Similarly, courts "may entertain motions that require it to answer only pure questions of law." United States v. Pope, 613 F.3d at 1260.

The "most prominent" reason for that rule is "respect for the role of the jury." United States v. Pope, 613 F.3d at 1259.[6] The jury is charged with determining a defendant's guilt or innocence, so fact-finding "based on evidence that goes to this question can risk trespassing on territory reserved to the jury." United States v. Pope, 613 F.3d at 1259. Criminal defendants are entitled to "'a jury determination that [they are] guilty of every element of the crime with which [they are] charged, beyond a reasonable doubt.'" Apprendi v. New Jersey, 530 U.S. 466, 477 (2000)(quoting United States v. Gaudin, 515 U.S. 506, 510 (1995)). That entitlement extends to so-called "sentencing factors," i.e., facts, "[o]ther than the fact of a prior conviction," that increase "the penalty for a crime beyond the prescribed statutory maximum." Apprendi v. New Jersey, 530 U.S. at 490.

That entitlement does not, however, extend to whether the criminal offense occurred within an applicable statute of limitations. See Musacchio v. United States, 136 S. Ct. 709, 718 (2016)(Thomas, J.)("When a defendant fails to press a limitations defense, the defense does not become part of the case and the Government does not otherwise have the burden of proving that it filed a timely indictment."); Smith v. United States, 133 S. Ct. 714, 720 (2013)(Scalia, J.)("[A]lthough the statute of limitations may inhibit prosecution, it does not render the underlying conduct noncriminal."); id. ("Commission of the crime *within the statute-of-*

---

[6]Other reasons for the rule include: (i) that evidence adduced at trial can provide a more certain framework for a court's analysis; (ii) that holding a separate mini-trial on a defense "only to repeat the exercise with largely the same evidence a short time later at the trial itself" disserves judicial economy; and (iii) that permitting pre-trial motions on matters to be presented at trial could "facilitate an end-run around the limited discovery rules governing criminal proceedings." United States v. Pope, 613 F.3d at 1259.

*limitations period* is not an element of the conspiracy offense.  The Government need not allege

the time of the offense in the indictment, and it is up to the defendant to raise the limitations

defense." (emphasis in original)(citations omitted)).  Accordingly, several United States Courts

of Appeals -- including the Tenth Circuit -- have held that a judge using a preponderance-of-the-

evidence standard determines whether a statute of limitations is tolled because the defendant was

a "person fleeing from justice." 18 U.S.C. § 3290.  See Ross v. U.S. Marshal, 168 F.3d 1190,

1194 (10th Cir. 1999); United States v. Florez, 447 F.3d 145, 149-50 (2d Cir. 2006); United

States v. Greever, 134 F.3d 777, 781 (6th Cir. 1998); United States v. Marshall, 856 F.2d 896,

900 (7th Cir. 1988); United States v. Gonsalves, 675 F.2d 1050, 1054 (9th Cir. 1982).[7]

Likewise, a criminal defendant's jury-trial right does not extend to other affirmative defenses

---

[7]The Court is aware that some authorities suggest that, while a court can determine by a preponderance of the evidence whether a statute like 18 U.S.C. § 3290 alters the relevant limitations period, a jury must determine, beyond a reasonable doubt, whether a crime took place within that period.  See United States v. Florez, 447 F.3d at 150 n.2; Wayne LeFave et al., 5 Criminal Procedure § 18.5(a), at 216 (4th ed. 2016).  The Court can discern no principled reason for the distinction.  Cf. State v. Abdon, 364 P.3d 917, 927 (Hawaii 2016)(stating that, because Hawaii law requires the jury to determine beyond a reasonable doubt whether a prosecution is timely, the jury must also determine beyond a reasonable doubt whether the statute of limitations was tolled).

Both United States v. Flores and Criminal Procedure base their distinction on authority -- specifically United States v. Salmonese, 352 F.3d 608 (2d Cir. 2003) -- and not on principal.  See United States v. Florez, 447 F.3d at 150 n.2; 5 Criminal Procedure, supra, § 18.5(a), at 216.  In United States v. Salmonese, the United States Court of Appeals for the Second Circuit rejected a sufficiency-of-the-evidence challenge to a jury's guilty verdict in a conspiracy prosecution, because even though the overt acts charged in the indictment occurred outside of the limitations period, a reasonable jury could have found beyond a reasonable doubt that a different overt act occurred within the limitations period.  See 352 F.3d at 624-25.  The fact that a court may submit a statute-of-limitations issue to the jury does not mean that a Court must do so.

In many instances, statute-of-limitations issues are so bound up with guilt-innocence issues regarding that it would not make sense for a court to make a separate pretrial statute-of-limitations determination.  For example, defendants might argue that they did not commit the charged criminal offense within the limitations period, because they did not commit the charged criminal offense at all.  While such arguments go to the timeliness of a prosecution as a formal matter, they should still be submitted to the jury, because evaluating such an argument requires determining whether the defendant is innocent or guilty.  When, however, a statute-of-limitations issue is distinct from the guilt-innocence issues, it is proper for a judge to decide that issue.

that do not negate an element of a crime.  See Patterson v. New York, 432 U.S. 197, 210

(1977)("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt

all of the elements included in the definition of the offense of which the defendant is charged.

Proof of the non-existence of all affirmative defenses has never been constitutionally required

. . . ."); Apprendi v. New Jersey, 530 U.S. at 477-78 (describing "trial by jury" and a "verdict

based on proof beyond a reasonable doubt" as "companion rights").   See also 6 Criminal

Procedure, supra, § 22.1(a), at 7 ("The right to jury trial also does not include an entitlement to a

jury decision on a fact designated by the legislature as a mitigating factor or an affirmative

defense, rather than as an element of the offense.").  Allowing courts to resolve factual disputes

that do not go to guilt or innocence when deciding a pretrial motion is thus in accord with both

rule 12(b) as well as the jury-trial right rationale underlying it.[8]

## LAW REGARDING THE STATUTE OF LIMITATIONS FOR ILLEGAL REENTRY

Under federal law, "no person shall be prosecuted, tried, or punished for any offense, not

capital, unless the indictment is found or the information is instituted within five years next after

such offense shall have been committed," 18 U.S.C. § 3282(a), except that "[n]o statute of

limitations shall extend to any person fleeing from justice," 18 U.S.C. § 3290.  In criminal cases,

statutes of limitation are "'to be liberally interpreted in favor of repose,'" and they "'normally

begin to run when the crime is complete.'"   United States v. Reitmeyer, 356 F.3d 1313, 1321

---

[8]If the Court were writing on a clean slate -- which it is not -- it would say that the jury-trial right is so paramount that the jury must decide all factual issues, even those issues that do not go to guilt or innocence.  There is little doubt that, with a special-verdict form, a well-instructed jury could handle such issues.  The Tenth Circuit has, however, held otherwise, see, e.g., Ross v. U.S. Marshal, 168 F.3d at 1194, and the Supreme Court of the United States has strongly suggested that it would affirm the Tenth Circuit's approach, see Smith v. United States, 133 S. Ct. at 720.  The parties can, however, waive a constitutional right, and by asking the Court to decide the statute-of-limitations issue on a pre-trial motion, the parties have waived any jury right.  If, however, one party were to insist on a jury trial, the Court would be reluctant to decide the statute-of-limitations issue without a jury.

(10th Cir. 2004)(quoting Toussie v. United States, 387 U.S. 112, 115)(1970)).   A statute-of-limitations defense "becomes part of a case only if the defendant puts the defense in issue." Musacchio v. United States, 136 S. Ct. at 718.  But once a statute-of-limitations defense enters a case, "the Government *then* bears the burden of establishing compliance with the statute of limitations by presenting evidence that the crime was committed within the statute of limitations period or by establishing an exception to the limitations period."   Musacchio v. United States, 136 S. Ct. at 718 (emphasis in original)(citing United States v. Cook, 84 U.S. 168, 179 (1872)). See Grunewald v. United States, 353 U.S. 391, 396 (1957)("The indictment in these cases was returned on October 25, 1954.  It was therefore incumbent on the Government to prove that the conspiracy, . . . was still in existence on October 25, 1951.")

"The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions."  Toussie v. United States, 397 U.S. at 114.  Statutes of limitations thus protect people from "having to defend themselves against charges when the basic facts may have become obscured by the passage of time."  Toussie v. United States, 397 U.S. at 114.  They also "minimize the danger of official punishment because of acts in the far-distant past" and "encourage[e] law enforcement officials promptly to investigate suspected criminal activity." Toussie v. United States, 397 U.S. at 114-15.

One commits an Illegal Reentry offense by: (i) being an alien who "has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding"; and (ii) "enter[ing], attempt[ing] to enter, or at any time [being] found in, the United States" without the Attorney General's express consent. 8 U.S.C. § 1326(a).  Illegal Reentry is a continuing offense that begins when an eligible person

reenters the United States and ends when that person is "found" in the United States.[9]  See United States v. Villarreal-Ortiz, 553 F.3d at 1330.  In this context, a defendant is found in the United States "when the government knows, or could have known through the exercise of diligence typical of law enforcement, the following: (1) the defendant is a prior deportee, (2) the defendant is illegally present in the United States (i.e., the defendant is an illegal alien), and (3) the defendant's whereabouts."  United States v. Villarreal-Ortiz, 553 F.3d at 1330.  See id. at 1327, 1330 (holding that a defendant who provided an alias to police when he was arrested was not found in the United States until "his true name was discovered" and observing that "there is no indication that he was identified as a prior deportee before that name was obtained").

## ANALYSIS

The Court determines that, as of June 13, 2011, federal immigration authorities had actual knowledge that Olivas-Perea was present in the United States and that he had been deported previously.  The Court also determines that, with reasonable law enforcement diligence, federal-immigration authorities would have discovered Olivas-Perea's whereabouts soon thereafter.  The Court thus concludes that Olivas-Perea was found in the United States on or about June 13, 2011.  Accordingly, 18 U.S.C. § 3282's five-year statute of limitations bars Olivas-Perea's prosecution, so the Court will grant Olivas-Perea's MTD.

## I.  THE COURT CAN PROPERLY ENTERTAIN THE MTD AS A PRETRIAL MOTION TO DISMISS.

In a criminal case, a court can grant a pretrial motion to dismiss if it can decide the motion "without a trial on the merits," Fed. R. Crim. P. 12(b)(1), i.e., if it can rule on the motion

---

[9]The Court assumes that, if someone surreptitiously reentered the United States and was never found there, then the offense would conclude when that person left the United States. While the offense would conclude, the offender could still be prosecuted until the statute of limitations had run.  Moreover, if the offender subsequently returned to the United States, that return would constitute a distinct Illegal Reentry offense.  To the Court's knowledge, however, there is no Tenth Circuit case law on this point.

without "deciding any disputed questions of fact about the circumstances of the alleged crime,"

United States v. Pope, 613 F.3d at 1260. A factual dispute's existence does not stop a court from deciding a pretrial motion to dismiss so long as the motion "implicates 'fact[s] peculiar to the motion,' and not facts surrounding the question of guilt or innocence." United States v. Pope, 613 F.3d at 1260 (quoting United States v. Covington, 395 U.S. 57, 60 (1969)). "Motions of this kind, however, may involve only the taking of evidence that is 'entirely segregable from the evidence to be presented at trial.'" United States v. Pope, 613 F.3d at 1260 (quoting United States v. Barletta, 644 F.2d at 58).

The only factual dispute between the United States and Olivas-Perea regarding the MTD is whether Olivas-Perea was found in the United States on or around June 13, 2011 or December 18, 2015. See MTD ¶ 18, at 7-8; Information at 1. For the purposes of the MTD, both parties agree that Olivas-Perea was found in the United States after he was deported in 2005 and that the Attorney General did not expressly consent to Olivas-Perea's return. To decide the MTD, the Court needs to determine only when, not whether, Olivas-Perea was found in the United States, so the Court faces a factual dispute that is peculiar to the MTD, and does not go to Olivas-Perea's guilt or innocence. See Smith v. United States, 133 S. Ct. at 720 ("[A]lthough the statute of limitations may inhibit prosecution, it does not render the underlying conduct noncriminal."); id. ("A statute-of-limitations defense does not call the criminality of the defendant's conduct into question, but rather reflects a policy judgment by the legislature that the lapse of time may render criminal acts ill-suited for prosecution."). See also id. ("Commission of the crime *within the statute-of-limitations period* is not an element of the conspiracy offense. The Government need not allege the time of the offense in the indictment, and it is up to the defendant to raise the limitations defense." (emphasis in original)(citations omitted)). Consequently, the Court may

entertain the MTD as a pretrial motion, because the MTD does not require "a trial on the merits." Fed. R. Crim. P. 12(b)(1).

The same result would obtain, however, even if the Court is incorrect regarding the need for a trial on the merits. The United States does not object to the MTD on procedural grounds in its briefing, and it did not object at the July 17, 2017 evidentiary hearing. In fact, the United States concurred in Olivas-Perea's request for "the Court to rule on the pending motion to dismiss." Motion for Ruling on Motion to Dismiss at 1, filed October 10, 2017 (Doc. 48); id. at ¶ 8, at 3 ("The undersigned counsel has conferred with Assistant United States Attorney Letitia Simms concerning this motion. The government concurs with Mr. Olivas' request for a ruling on the motion."). See id. ¶ 5, at 2 ("The guideline sentencing range for Mr. Olivas without the fast track plea agreement is 18 months to 24 months in prison. Mr. Olivas has already spent nearly 21 months in custody, mostly as a result of the charges in this case.").

Accordingly, the United States has waived any potential objection to the Court treating and deciding the MTD as a pretrial motion. See United States v. Olano, 507 U.S. 725, 732-33 (1993)("Deviation from a legal rule is 'error' unless the rule has been waived. . . . Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938))). See also United States v. Hall, 20 F.3d 1084, 1088 (10th Cir. 1994)("[A] district court [can] dismiss charges at the pretrial stage under the limited circumstances where the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case."). Indeed, the United States -- like Olivas-Perea -- has sent every signal to the

Court, by its arguments, actions, and omissions, that it wants the Court to decide the statute-of-limitations issue via pretrial motion.  The Court will oblige.

## II.    OLIVAS-PEREA WAS FOUND IN THE UNITED STATES ON OR ABOUT JUNE 13, 2011.

The United States "bears the burden of establishing compliance with the statute of limitations."  Musacchio v. United States, 136 S. Ct. at 718.  See Grunewald v. United States, 353 U.S. 391, 396 (1957)("The indictment in these cases was returned on October 25, 1954.  It was therefore incumbent on the Government to prove that the conspiracy . . . was still in existence on October 25, 1951.").  In this case, that burden of proof means that the United States needs to establish that the Information was "instituted within five years next after" Olivas-Perea committed Illegal Reentry by being found in the United States.  18 U.S.C. § 3282(a).  For the purposes of the Illegal Reentry statute, 8 U.S.C. § 1326, one is found in the United States "when the government knows, or could have known through the exercise of diligence typical of law enforcement, the following: (1) the defendant is a prior deportee, (2) the defendant is illegally present in the United States (i.e., the defendant is an illegal alien), and (3) the defendant's whereabouts."  United States v. Villarreal-Ortiz, 553 F.3d at 1330.  On June 13, 2011, Homeland Security knew -- not constructively, but actually -- that Olivas-Perea was in the United States and that his presence was illegal.  See DHS Person Summary at 1; ICE logbook at 1.  Consequently, the only remaining issue is whether, with the diligence typical of law enforcement, Homeland Security would have known Olivas-Perea's whereabouts.

Olivas-Perea stated, under oath, that he lived at 3216 North Platte Road from a couple years before he was arrested on June 11, 2011, until he was arrested in January of 2016.  See Tr. at 13:16-16:1 (Robert, Olivas-Perea).  He also testified that he worked at Lopez Roofing throughout that time period.  See Tr. at 16:5-8 (Robert, Olivas-Perea).  The booking form from

Olivas-Perea's June 11, 2011 arrest contains his address. See Booking Form at 3, 6, 8, 10. That form lists Olivas-Perea's name as "Max Olivas," Booking Form at 3, 6, but Homeland Security knew that the names "Max Olivas" and "Maximo Olivas-Perea" referred to the same person, DHS Person Summary 1. While that booking form was not provided to ICE, see Tr. at 37:19-21 (Saucedo), ICE has, in other cases, been able to obtain booking records from Santa Fe County by "go[ing] through the arresting officer, . . . or through the DA's [District Attorney's] Office," Tr. at 45:24-46:4 (Robert, Saucedo). Alternatively, ICE -- like the federal public defender -- could have obtained the booking form via a public records request. See Tr. at 61:4-13, 15-19 (Porter). Consequently, the Court concludes that "the government . . . could have known through the exercise of diligence typical of law enforcement" Olivas-Perea's whereabouts on or about June 13, 2011. United States v. Villarreal-Ortiz, 553 F.3d at 1330.

The Court is sympathetic to the United States' arguments that the ICE agents in New Mexico may not have been apprised of the information regarding Olivas-Perea and that "resources seem to [have] be[en] very thin, with 6 officers in charge of all the apprehensions in 21 counties." Tr. at 67:22-68:1 (Simms). The Court does not find either argument persuasive, however. As to the first argument, the legal test for determining whether a defendant is found in the United States references the federal government's knowledge, actual or constructive, and not the knowledge of any particular individual within the federal government, such as the ICE agents who happened to be stationed in Albuquerque in 2011. See United States v. Villarreal-Ortiz, 553 F.3d at 1330. See also United States v. Rosales-Garay, 283 F.3d 1200, 1203 (10th Cir. 2002)(Baldock, J.)(stating that, for an alien to be found in the United States, "the government must have 'knowledge of the illegality of his presence through the exercise of diligence typical

of law enforcement authorities'" (quoting <u>United States v. Bencomo Castillo</u>, 176 F.3d 1300, 1303 (10th Cir. 1999))).

As to the second argument, even if the local ICE agents acted reasonably in light of the resources available, that does not mean that they exhibited "diligence typical of law enforcement." <u>United States v. Villarreal-Ortiz</u>, 553 F.3d at 1330. The Court agrees with the Olivas-Perea that the diligence typical of law enforcement professionals is an objective standard akin to the performance expected of other professionals. <u>See</u>, <u>e.g.</u>, <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984)("When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."). That objective standard allows courts to decide cases by evaluating only how difficult it would have been for immigration officials to discover a given defendant. If immigration authorities could have, with diligence typical of law enforcement, determined the whereabouts of someone who had illegally reentered the United States but choose not to do so -- because of resource constraints or for some other reason -- then courts will hold immigration authorities to that choice by enforcing the statute of limitations that Congress enacted. An alternative standard focused whether immigration officials acted reasonably given all of the circumstances -- including immigration authorities' resource constraints -- would require courts to evaluate the entire federal immigration-enforcement system and to second guess immigration officials' policy decisions regarding enforcement priorities. It also would weaken the statute of limitations' "salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." <u>Toussie v. United States</u>, 397 U.S. at 115.

The Court concludes that the United States has not borne its "burden of establishing compliance with the statute of limitations." <u>Musacchio v. United States</u>, 136 S. Ct. at 718.

Federal immigration authorities had actual knowledge of Olivas-Perea's presence in the United States and of his immigration status as of June 13, 2011. That the address of Olivas-Perea's residence was a matter of public record indicates that federal immigration authorities had constructive knowledge of Olivas-Perea's whereabouts, i.e., that they could have discovered his whereabouts with diligence typical of law enforcement. Olivas-Perea was thus found in the United States on or around June 13, 2011. The Information was filed on December 2, 2016. It follows that the United States filed the Information more than five years after Olivas-Perea completed his Illegal Reentry offense, so Olivas-Perea's prosecution is time-barred. See 18 U.S.C. § 3282(a). Accordingly, the Court will grant the MTD.

IT IS ORDERED that: (i) the Defendant's Motion to Dismiss Information for Violation of Statute of Limitations, filed June 2, 2017 (Doc. 33) is granted; and (ii) the Information, filed December 2, 2015 (Doc. 15) is dismissed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James D. Tierney
  Acting United States Attorney
Letitia Carroll Simms
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Marc H. Robert
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

    *Attorney for the Defendant*